548 So.2d 1294 (1989)
Donald J. STEIGHNER
v.
MISSISSIPPI STATE BAR.
No. CM-260.
Supreme Court of Mississippi.
August 16, 1989.
Donald J. Steighner, Butler, Pa., pro se.
Connie S. Jelliffe, Michael B. Martz, Jackson, for appellee.
En Banc.
PITTMAN, Justice, for the Court:
The Mississippi State Bar filed a Formal Complaint against Donald J. Steighner, alleging that he had violated several provisions of the Code of Professional Responsibility, which was in effect at that time, and Miss. Code Ann. § 73-3-35 (1972). A trial on the merits was conducted by a Complaint Tribunal. The Tribunal found that Steighner had violated the provisions of DR 6-101(A)(2 and 3) and DR 7-101(A)(1 and 2) of the Code of Professional Responsibility and imposed a thirty (30) day suspension. Steighner appeals, assigning as error:

I. THE DECISION OF THE COMPLAINT TRIBUNAL FINDING THE APPELLANT IN VIOLATION OF THE CODE OF PROFESSIONAL CONDUCT WAS INCORRECT AND NOT SUPPORTED BY THE EVIDENCE.

STATEMENT OF THE FACTS
In 1983 Phyllis Taggart was experiencing medical problems, and as a result consulted with Dr. Perrin Smith, a gynecologist. Dr. Smith performed a hysterectomy on June 9, 1983, in the Golden Triangle Medical Center in Columbus, Mississippi. Mrs. Taggart was discharged on June 17, 1983. She was re-admitted for surgery on June 25, 1983, and was operated on by Dr. Miles, a partner of Dr. Smith. Sometime after that, in June or July, 1983, Mrs. Taggart retained Mr. Steighner on a contingency-fee basis to represent her on a malpractice claim. Mr. Steighner told Mrs. Taggart that he would need a complete set of her medical records.
Mr. Steighner received Mrs. Taggart's medical records, although he could not say when. Mr. Steighner claimed that from the time he was retained until May, 1984, he was keeping in touch with Mrs. Taggart via telephone, checking on how her health was affecting her daily activities. Steighner reviewed Mrs. Taggart's medical records, and had his wife, who was an R.N., review them. Steighner spoke to a Dr. Sams, who was the anesthesiologist during Mrs. Taggart's surgery. Steighner *1295 reported that Sams felt that there was nothing unusual about the case. Steighner did not get a statement from Sams, nor did he depose him. Steighner also read the notes made by the nurses who were at the surgery. According to Steighner, the notes indicated nothing unusual, although he did not get statements from any of the nurses. Mr. Steighner was able to find out who Dr. Smith's insurance agent was, but little else. According to Steighner, Dr. Miles, who had assisted Dr. Smith during the June 9 surgery, and had performed the June 25 surgery, would not talk to him at all. As of May, 1984, Steighner had not found any expert witnesses who would testify that the doctors who had operated on Mrs. Taggart had been negligent or had deviated from accepted standards of practice.
On May 23, 1984, Steighner wrote to Mrs. Taggart, stating that he had been reading her medical records and needed more clarification on the facts. He asked Mrs. Taggart to compile for him a complete summary of her medical problems leading up to and including the surgeries in question. Mrs. Taggart complied with this request in a timely fashion. On June 4, 1985, Steighner filed suit in U.S. District Court in the Northern District of Mississippi, with the complaint styled "Phyllis Taggart and Charles L. Taggart v. The Columbus Women's Clinic and Dr. Perrin Smith." The Columbus Women's Clinic was later dismissed from the suit, as Mrs. Taggart was never hospitalized there. The primary reason the suit was filed was to toll the running of the statute of limitations.
In June, 1985, Mrs. Taggart, who had moved with her family to East Moline, Illinois in January, 1984, came back to Columbus to be deposed. This was the only deposition that Steighner took. He also did not file any interrogatories and did not request production of any documents, saying that he already had "all the documents I needed  that existed." He allegedly consulted with at least two doctors. The first was a Phillipine doctor, but Steighner did not talk to him personally and could not remember his name. The Phillipine doctor did suggest to Steighner's associate that they consult with Dr. John Wilson, an emergency room physician in Tupelo who had a background in forensic medicine. According to Steighner, Wilson reviewed the file and concluded that while Dr. Smith's bedside manner could be improved, there was nothing wrong with the surgery that he had performed, and Mrs. Taggart was the victim of an "untoward incident". Steighner claimed that Dr. Wilson dictated a statement of his opinion, but could not find the tape, and the taped statement had never been reduced to writing. Steighner never reduced the statement to writing because he did not want it to be discoverable. Steighner did not consult with Dr. Wilson until after December 20, 1985.
On December 20, 1985, Dr. Smith filed a Motion for Summary Judgment. Steighner never filed any response to this Motion. Steighner never wrote to Mrs. Taggart to inform her about the Motion. He did not remember whether he had sent a copy of the Motion to Mrs. Taggart. He was aware that a response was required within ten days. On February 25, 1986, Dr. Smith's Motion for Summary Judgment was granted by the Court. Steighner did not discuss appealing the decision with Mrs. Taggart. Although Steighner claimed to have told Mrs. Taggart that "she had no case", he never informed her that if her suit was dismissed, she had no further recourse against Dr. Smith and Golden Triangle Medical Center. Steighner did not remember Mrs. Taggart ever requesting her file so that another attorney might review it. Steighner never wrote to Mrs. Taggart to inform her about his opinion that there was no case and that it would soon be dismissed "[b]ecause we spoke so often together. I felt that we had that communication. She was forever calling me and I felt we had that communication." As to why he did not take a voluntary nonsuit against the defendants instead of allowing the summary judgment motion to ripen, Steighner claimed that he just kept looking and hoping that something would turn up to support the suit. Mrs. Taggart has not sued Steighner for malpractice.
*1296 According to Mrs. Taggart, she began experiencing problems after the June 9 hysterectomy, until she finally had to be re-admitted for surgery on June 25, 1983. This surgery was performed by Dr. Miles, Dr. Smith's partner. It lasted four and a half hours, and Mrs. Taggart claimed that after the emergency surgery, Dr. Miles "told my husband and I that he had to take out part of my bowels and clean them up that they had been nicked up by Dr. Smith and that my stomach lining had been nicked up." According to Mrs. Taggart, she was not charged anything for the second surgery because of this. Mrs. Taggart believed that she paid Steighner $100.00 so that he could obtain her medical records. Steighner also told Mrs. Taggart that once he got her medical records, he would send them to Jackson to be examined by a panel of doctors. She complained that she never could seem to contact Steighner at his office, and when she could he was not very forthcoming, so she began to call him at his home, usually around 6:00 A.M. After Mrs. Taggart was deposed, she claimed that Steighner told her that Dr. Smith would be deposed the next day. Mrs. Taggart asked that Steighner contact her and tell her how it went. When he did not contact her, she called to find out what had happened, and Steighner told her first, that he had been unable to set up the deposition, and later told her that Dr. Smith was too busy and "[t]hat he would just lie about it anyway."
The next contact Mrs. Taggart had with Steighner came after the granting of the summary judgment motion. When Mrs. Taggart asked Steighner why the suit had been dismissed, he told her that she would have to get a doctor to explain it. It was at this time that she first considered filing a complaint with the Bar. Mrs. Taggart also contacted two Mississippi attorneys, Mr. Carter and Mr. Liston, to advise her on her further options against the doctors or against Steighner. She decided not to sue Steighner. The only expenses Mrs. Taggart could remember incurring were for the first set of medical records that Steighner requested, and approximately $68.00 for a filing fee. Mrs. Taggart felt that Steighner had written her "maybe a couple" of times besides the May 23, 1984 letter. Mrs. Taggart estimated that between June, 1983, and February, 1986, she had telephoned Steighner two hundred times, although she could not remember the amounts of any of her bills. She remembered Steighner calling her a couple of times. He notified her of the dismissal of the suit by telephone. When Steighner sent Mrs. Taggart a copy of the judgment of dismissal, he did not include any kind of cover letter or explanation.
The Mississippi Bar Association filed a Formal Complaint against Steighner on March 4, 1987. The Complaint alleged that Steighner had violated certain provisions of the Code of Professional Responsibility, including DR 1-102(A)(4, 5, and 6), DR 6-101(A)(2 and 3), DR 7-101(A)(1 and 3), and Miss. Code Ann. § 73-3-35 (1972). The Complaint asked the Tribunal to take appropriate disciplinary action against Steighner, and to order him to pay $38.17, the costs of filing the Formal Complaint, along with the costs and expenses of the litigation of the Formal Complaint. Chief Justice Roy Noble Lee designated John C. Love, Jr., John W. Prewitt, Sr., and Fred Ross, Jr. to sit as members of the Complaint Tribunal.
The Bar made a Motion for Entry of Default Judgment on May 27, 1987. In its Motion the Bar alleged that Steighner had been served with a copy of the Formal Complaint on April 10 and April 21, 1987, that he had not answered the Complaint within thirty days, and that a default judgment should be entered against Steighner. Steighner finally answered the Complaint on June 11, 1987, denying any deficient conduct. Steighner also moved to set aside the Bar's Default Motion, alleging that he had valid defenses to the Complaint and had had a heavy caseload during this time. A hearing was held by the Complaint Tribunal on the Default Motion on June 16, 1987. Because of Steighner being a solo practitioner who had been involved in several felony criminal cases, and because of health problems experienced by Steighner's children, the Tribunal found that Steighner *1297 would be allowed to file his answer out of time, and the matter would not be heard as a default matter.
The Formal Complaint against Donald Steighner was heard on September 16, 1987. Steighner and Mr. and Mrs. Taggart appeared as witnesses. On November 9, 1987, the Tribunal issued its Order. It found that Steighner had violated DR 6-101(A)(2 and 3) and DR 7-101(A)(1 and 2) of the Code of Professional Responsibility, and should be suspended from the practice for thirty (30) days.
This Court conducts de novo review of attorney discipline cases. Rule 9.4 of the Rules of Discipline for the Mississippi State Bar; Foote v. Mississippi State Bar Association, 517 So.2d 561, 564 (Miss. 1987). This Court may impose a sanction more or less severe than that imposed by the Complaint Tribunal. Foote, 517 So.2d at 564. No discipline shall be imposed except upon clear and convincing evidence. Rule 8.6 of the Rules of Discipline.
The Formal Complaint alleged that Steighner had violated the following provisions of the Code of Professional Responsibility: DR 1-102(A)(4, 5, and 6); DR 6-101(A)(2 and 3); and DR 7-101(A)(1 and 3). The text of these provisions is as follows:
DR 1-102. Misconduct
(A) A lawyer shall not:
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice.
(6) Engage in any other conduct that adversely reflects on his fitness to practice law.
DR 6-101. Failing to Act Competently
(A) A lawyer shall not:
(2) Handle a legal matter without preparation adequate in the circumstances.
(3) Neglect a legal matter entrusted to him.
DR 7-101. Representing a Client Zealously
(A) A lawyer shall not intentionally:
(1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7-101(B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests of opposing counsel which do not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.
(3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7-102(B).
The Bar also alleged that Steighner had violated Miss. Code Ann. § 73-3-35 (1972), which states:
Every attorney and counselor at law, before he shall be permitted to practice, shall produce his license in each court where he intends to practice, and in the presence of such court, shall take the following oath or affirmation to wit:
"I do solemnly swear (or affirm) that I will demean myself, as an attorney and counselor of this court, according to the best of my learning and ability, and with all good fidelity as well to the court as to the client; that I will use no falsehood nor delay any person's cause for lucre or malice, and that I will support the constitution of the State of Mississippi so long as I continue a citizen thereof. So help me God."
And thereupon the name of such person, with the date of his admission, shall be entered in a roll or book to be kept in each court for that purpose.
Steighner was found by the Complaint Tribunal to have violated DR 6-101(A)(2 and 3) and DR 7-101(A)(1 and 2), even though there was no allegation concerning DR 7-101(A)(2). DR 7-101(A)(2) states:
(A) A lawyer shall not intentionally:
(2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2-110, DR 5-102, and DR 5-105.
Factors generally considered for imposition of sanctions for misconduct are (1) the nature of misconduct, (2) the need to *1298 deter similar misconduct, (3) preservation of dignity and reputation of the profession, (4) protection of the public and (5) sanctions imposed in similar cases. Mississippi State Bar Association v. A Mississippi Attorney, 489 So.2d 1081, 1083 (Miss. 1986). The purpose of discipline "is not to punish the guilty attorney, but to protect the public, the administration of justice, to maintain appropriate professional standards, and to deter similar conduct." 489 So.2d at 1084. This Court may discipline an attorney for conduct which occurs outside the attorney-client relationship. See Brumfield v. Mississippi State Bar Association, 497 So.2d 800 (Miss. 1986) (misconduct in handling relative's affairs grounds for discipline).
Sanctions imposed by this Court are done on a case-by-case basis. See Clark v. Mississippi State Bar Association, 471 So.2d 352 (Miss. 1985) (misappropriation of conservatorship funds; Complaint Tribunal imposes disbarment; Supreme Court affirms); Myers v. Mississippi State Bar, 480 So.2d 1080 (Miss. 1985) (deliberate abandonment of criminal defendant at crucial stage of trial; Complaint Tribunal imposes two-year suspension; Supreme Court affirms); Mississippi State Bar Association v. A Mississippi Attorney, 489 So.2d 1081 (Miss. 1986) (excessive fee charged for writing will for relatively small estate; Complaint Tribunal imposes private reprimand; Supreme Court affirms); Brumfield v. Mississippi State Bar Association, 497 So.2d 800 (Miss. 1986) (defrauding family members while acting in a representative and fiduciary capacity; Complaint Tribunal imposes ninety (90) day suspension; Supreme Court imposes disbarment); Hoffman v. Mississippi State Bar Association, 508 So.2d 1120 (Miss. 1987) (knowing participation in double-billing of client and fraudulent procurement of funds; Complaint Tribunal imposes disbarment; Supreme Court imposes one-year suspension); Mississippi State Bar v. Young, 509 So.2d 210 (Miss. 1987) (participation in scheme to bribe state official; Complaint Tribunal dismisses formal complaint; Supreme Court imposes one-year suspension); Foote v. Mississippi State Bar Association, 517 So.2d 561 (Miss. 1987) (converting funds obtained from purchaser at real estate closing; Complaint Tribunal imposes disbarment; Supreme Court affirms); Goeldner v. Mississippi State Bar Association, 525 So.2d 403 (Miss. 1988) (deliberate misrepresentation of fees due, as well as number of hours spent working on conservatorship and collection of assets, in order to obtain hourly rate in excess of that allowed by Chancellor's order; Complaint Tribunal imposes disbarment; Supreme Court imposes two-year suspension); Mississippi State Bar Association v. Moyo, 525 So.2d 1289 (Miss. 1988) (soliciting case and converting minor client's money; Complaint Tribunal imposes public reprimand; Supreme Court imposes disbarment); Mississippi State Bar v. Edwins, 534 So.2d 218 (Miss. 1988) (failure to render proper accounting of settlement funds in workers' compensation cases, charging fee in excess of amount permitted under workers' compensation statute and commingling of funds; Supreme Court imposes two-year suspension).
Most of the cases cited above involve intentional or deliberate behavior. Vining v. Mississippi State Bar Association, 508 So.2d 1047 (Miss. 1987), deals with a set of facts much like those in the case at bar. In Vining, the attorney "accepted employment and then neglected the case though he regularly told his client that he was handling the matter. As a result nothing was done in the case and the statute of limitations ran." 508 So.2d at 1047. Vining offered three extenuating circumstances in his plea for mercy, those being: (1) his personal health; (2) the health of a family member; and (3) "a matter of personal distress." 508 So.2d at 1049. Because of these circumstances, this Court reversed the one hundred twenty (120) day suspension imposed by the Complaint Tribunal and assessed instead a public reprimand. However, this was not "because [this Court] consider[d] the 120 days suspension meted out by the Mississippi State Bar Complaint Tribunal to be overly punitive and severe. The punishment was in keeping with the misconduct."
*1299 The Complaint Tribunal apparently found that there was no violation of DR 1-102 by Steighner. Violations of DR 1-102 have been found in the past in cases of deliberate or intentional misconduct. See Goeldner, 525 So.2d at 406; Moyo, 525 So.2d at 1298; Foote, 517 So.2d at 563. Steighner's conduct does not appear to have been dishonest or fraudulent, but incompetent and negligent. The Tribunal's finding as to DR 1-102 is in line with the cited authorities.
As to DR 6-101, there appears to be clear and convincing evidence that Steighner was inadequately prepared to handle Mrs. Taggart's suit throughout its existence, and that he neglected this matter continually. This Court finds that the Complaint Tribunal's finding as to DR 6-101 is correct. As to DR 7-101, there appears to be clear and convincing evidence to support the Complaint Tribunal's finding of violations of (A)(1 and 2). Steighner does not appeal the finding of a violation of (A)(2), even though no violation of (A)(2) was alleged by the Bar in its Formal Complaint. Considering that "[h]earings before Complaint Tribunals shall be as cases in chancery," it follows that this matter could have tried by the implied consent of the parties. Rule 8(a) of Rules of Discipline for the Mississippi State Bar; Miss. Code Ann. § 73-3-325 (Supp. 1988); Miss.R. Civ.P. 15(b). In any event, the finding is not here challenged.
The Bar argues that while the findings of violations were correct, the thirty-day suspension was too lenient. The Bar relies on Vining; and, as stated earlier, the facts of Vining are very similar to the case at bar. This Court took into consideration certain extenuating circumstances in Vining, and for this reason did not affirm the 120-day sanction imposed by the Complaint Tribunal. There do not appear to be such extenuating circumstances here. Steighner still does not appear to understand what, if anything, he did wrong. The facts and the offense and the findings of the Complaint Tribunal justify a suspension of one hundred eighty (180) days.
Finding no reversible error below, the judgment of the Complaint Tribunal is affirmed as to the findings; as to the sanctions, this Court finds that a suspension of one hundred eighty (180) days is justified.
COMPLAINT TRIBUNAL'S FINDING FOR DISCIPLINARY ACTION AFFIRMED; COMPLAINT TRIBUNAL'S 30-DAY SUSPENSION REVERSED, AND 180-DAY SUSPENSION IMPOSED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and BLASS, JJ., concur.
DAN M. LEE, P.J., concurs as to suspension and dissents as to increasing the suspension from 30 days to 180 days.